## IN THE UNITED STATES COURT OF FEDERAL CLAIMS

|  |  |  |
|---|---|---|
| SECOND STREET HOLDINGS LLC, *et al.*, | ) ) ) |  |
| Plaintiffs, | ) ) | No. 22-cv-00253 |
| v. | ) ) | Filed: September 19, 2022 |
| THE UNITED STATES, | ) ) | Reissued: October 4, 2022[1] |
| Defendant, | ) ) |  |
| and | ) ) |  |
| CAYRE JEMAL'S NICK LLC, | ) ) |  |
| Defendant-Intervenor. | ) ) ) |  |

## OPINION AND ORDER

This bid protest is the most recent in a series of protests involving the lease procurement for the Securities and Exchange Commission's ("SEC") new headquarters office building in Washington, D.C.  The incumbent landlords, Plaintiffs Second Street Holdings LLC, 600 Second Street Holdings LLC, and Seven Hundred 2nd Street Holdings LLC (collectively "Second Street"), challenge the General Services Administration's ("GSA") award of the lease to Defendant-Intervenor Cayre Jemal's Nick LLC ("CJN").

---

[1] The Court issued this opinion under seal on September 19, 2022, and directed the parties to file any proposed redactions by September 28, 2022.  The opinion issued today incorporates the proposed redactions received by CJN.  Upon review, the Court finds that the material identified warrants protection from public disclosure, as provided in the applicable Protective Order (ECF No. 11).  Redacted material is represented by bracketed ellipses "[. . .]."  The Court has also substituted the names of four banks with anonymous monikers—*e.g.*, "Bank #1," "Bank #2," etc.

For the reasons below, the Government's and CJN's Cross-Motions for Judgment on the Administrative Record are **GRANTED**, and Second Street's Motion for Judgment and its Motions to Supplement the Administrative Record are **DENIED**.

## I. BACKGROUND

### A.      Findings of Fact

The SEC currently leases space for its headquarters office from Second Street.  The space is in three buildings owned by Second Street located at 100 F Street, 600 Second Street, and 700 Second Street in northeast Washington, D.C.  Admin. R. 154, ECF Nos. 19–22 ("AR").[2]  The leases were originally set to expire on April 24, 2019.  *Id.*  Through an agreed-to extension, all three leases are now set to expire on September 30, 2023.  AR 7763.

Several years ago, the SEC began contemplating a potentially new headquarters location. In December 2016, the SEC sought and ultimately obtained approval for a leasing prospectus from its congressional oversight committees.  AR 156, 216, 218.  In June 2017, GSA solicited expressions of interest ("EOI") from building owners in Washington, D.C.  It received five EOIs it total, some proposing new construction and others proposing development of existing space. AR 211, 229, 266.  On July 10, 2018, GSA issued Request for Lease Proposals No. 5DC0392 ("RLP") for 1.274 million rentable square feet of office and related space for SEC's new headquarters.  AR 278–81.  The initial lease term was set at 15 years, with an optional 10-year renewal term.  AR 279.  The RLP required that the location offered be within the "Central Employment Area" of Washington, D.C.  *Id.*  It outlined certain "unique requirements" that the

---

[2] For ease of reference, this opinion cites to the bates-stamped page number of the Administrative Record rather than the ECF page number.

space must have, as well as certain neighborhood, parking, location amenities, and public transportation requirements.  AR 279–80.

Among other things, the RLP stated that occupancy was "required in accordance with the schedule outlined in the Schedule for Completion of Space paragraph" found in section 4.01 of the offered lease attached to the RLP.  AR 279.  In turn, subsection (J) of that provision, as amended, stated that the awardee must "complete all work required to prepare the Premises as required in this Lease ready for use not later than 330 Working days following issuance of NTP [notice to proceed]."  AR 884.  However, if the requirements of the RLP were "being satisfied through the construction of a new building(s)," the awardee had to complete "all work required to prepare the Premises as required in this Lease ready for use not later than 1,060 Working days following Lease Award."  *Id.*

Section 4.09 of the RLP provided that all offers would be evaluated using a present value price evaluation formula.  AR 298.  It further stated that GSA would evaluate offered prices "based on the annual price per ABOA SF, including all required option periods."[3]  *Id*.  The RLP also provided that GSA would perform the present value price evaluation by, among other things, adding "[t]he cost of relocation of furniture, telecommunications, replications costs, and other move-related costs, if applicable," to the offerors' gross present value cost.  *Id*.  Section 4.03 of the RLP stated that the lease would be awarded to "the responsible Offeror whose offer conforms to the requirements of [the] RLP and the Lease documents and is the lowest priced technically acceptable offer submitted."  AR 297.

---

[3] ABOA is defined as "the area 'where a tenant normally houses personnel, and/or furniture, for which a measurement is to be computed,' as stated by the American National Standards Institute/Building Owners and Managers Association (ANSI/BOMA) publication, Z65.1-1996."  48 C.F.R. § 552.270-4(a).

Under the RLP, proposals were due by September 4, 2018.  AR 274.  In response, GSA received three offers from Second Street, CJN, and Poplar Point RBBR, LLC, respectively.  AR 1056–2634.  On October 20, 2018, GSA documented its initial present value analysis of each offer.  AR 2663, 2670.  GSA then held in-person discussions with each of the three offerors between October 23 and 25, 2018.  AR 2663–96; *see* AR 7764.  On December 20, 2018, GSA issued deficiency letters, and all offerors submitted revised proposals on January 25, 2019.  AR 2701, 2703, 2706–3557, 3566–5451.  On May 20, 2019, GSA notified Poplar Point that its proposed space did not meet the minimum amenities requirements, and it was thus excluded from further consideration.  AR 7764.  The agency conducted negotiations with CJN and Second Street based on their revised proposals on May 30, 2019.  AR 6120, 6118.  On June 21, 2019, Second Street and CJN submitted their final proposal revisions.  AR 6122, 6142.

As more fully discussed below, automatic and voluntary stays related to several pre-award protests prevented GSA from making a timely award under the RLP.  AR 7764.  On March 2, 2020, the same day that the final pre-award protest was denied, GSA notified CJN that it was the Apparent Successful Offeror ("ASO").  AR 6250.  CJN submitted a signed lease to GSA on August 5, 2020.  AR 6418.

The procurement was further delayed, however, because the SEC initially refused to sign a final occupancy agreement and reimbursable work authorization.  AR 8065 (August 2019 letter from the SEC to GSA stating that the previously signed preliminary occupancy agreement dated August 9, 2016, "is hereby cancelled" until a new agreement could be reached); AR 8066 (January 2020 email from the SEC to GSA stating that the SEC will not provide funds requested by GSA nor sign a new occupancy agreement until SEC's "concerns are addressed").  Specifically, at that time the SEC did not approve of GSA's proposed evaluation methodology.  It believed GSA's

"methodology for evaluating the future purchase option would result in the unnecessary expenditure of hundreds of millions of additional dollars."  AR 8057; *see* AR 8069, 8070, 8072–74.  This disagreement between the SEC and GSA, as well as the onset of the coronavirus pandemic, led to delays in moving forward with the award.  AR 8069 (March 2020 letter standing that the SEC is focusing on the coronavirus pandemic, but that the agency will "make all reasonable efforts to engage" with GSA on the procurement); AR 8075–77.

On January 19, 2021, the SEC sent a letter to GSA stating that the "serious questions" underlying the inter-agency dispute "should be addressed by new leadership at both agencies," and that "further communications between SEC and GSA should follow the change in administration." AR 8078.  Accordingly, officials from GSA and the SEC met on May 24, 2021, and the SEC finally agreed to provide the necessary funding and sign a new occupancy agreement.  AR 8079.

On July 14, 2021, the SEC executed a new occupancy agreement with GSA, and on August 3, 2021, GSA accepted a Reimbursable Work Authorization from SEC.  AR 6593.  Finally, on September 30, 2021, GSA executed the lease with CJN.  AR 6776.  GSA notified Second Street that it was the unsuccessful offeror that same day.  AR 6955.

### B.    Procedural Background

#### 1.    Pre-Award Protests

The procurement at issue has been plagued by litigation from the get-go.  Shortly after GSA issued the RLP, Second Street filed an agency-level protest with GSA, and later a protest at the Government Accountability Office ("GAO"), challenging section 7.03 of the lease.  That provision provided the Government, "at no additional cost, the freely and fully assignable option to purchase the Property" at the expiration of both the initial and the renewal terms.  AR 348; s*ee* AR 886–94, 940–65.  Second Street argued that section 7.03 was inconsistent with GSA's standard

practice, required GSA to make "a wild guess" as to the future fair market value of the property, and was therefore unfair.  AR 890.  On October 4, 2018, the GSA lease contracting officer ("CO") issued a final decision denying Second Street's agency-level protest.  AR 895.  The GAO similarly denied Second Street's subsequent protest on January 17, 2019.  AR 1023.  On April 1, 2019, Second Street filed a complaint in the Court of Federal Claims raising the same pre-award challenge to the purchase option provision that it raised before the agency and the GAO.  *See Second St. Holdings, LLC v. United States*, 144 Fed. Cl. 361, 368 (2019).  The Court denied Second Street's protest in July 2019, holding that the purchase option provision was reasonable and that it did not violate procurement law.  *Id.* at 373–77.

Meanwhile, Poplar Point pursued its own protests.  On May 30, 2019, Poplar Point filed a protest at the GAO, arguing, among other things, that GSA's exclusion of Poplar Point from further consideration was arbitrary and capricious and that it had evaluated its proposal in a disparate fashion.  *See Poplar Point RBBR, LLC v. United States*, 147 Fed. Cl. 201, 209–10 (2020).  On September 3, 2019, the GAO denied the protest.  *Id.* at 210.  Poplar Point then filed suit in the Court of Federal Claims, which similarly denied its protest on March 2, 2020, holding that GSA's evaluation was reasonable and consistent with federal procurement law.  *Id.*

2.    Post-Award Protests

After receiving notice that GSA selected CJN as the awardee, Second Street filed a post-award protest at the GAO on October 12, 2021.  It argued that "drastic events have occurred" in the over three intervening years between the initial lease proposals and award that "have materially altered the commercial leasing landscape," and that must have changed GSA's needs.  AR 6970.  Second Street also alleged that GSA waived or materially relaxed the solicitation's "occupancy

requirement," and failed to amend the solicitation and solicit revised proposals based on an updated wage determination issued by the United States Department of Labor. *Id.*

On October 26, 2021, the GAO partially dismissed Second Street's protest. AR 7308–10. It held that there was "no question" that Second Street knew or should have known of the alleged impacts of the coronavirus pandemic on GSA's requirements and the updated wage determination more than 10 days before Second Street filed its protest. AR 7309. Therefore, Second Street's protest was untimely. *Id.* The GAO further held that because the lease was already fully executed and does not contain a termination for convenience provision, even if it were successful, Second Street's remedy would be limited to reimbursement for bid and proposal costs. AR 7310.

On November 2 and 3, 2021, Second Street filed two additional protests at the GAO. AR 7321–60, 7658–74. This time Second Street alleged multiple errors in the procurement, including that GSA (1) "waited too long, without justification, to make the award decision" and failed to consider the changes wrought by the coronavirus pandemic; (2) prejudicially waived material RLP requirements for CJN, such as the occupancy date requirement; (3) performed a "deeply flawed" price analysis; and (4) "may have engaged in discussions" with CJN after it and Second Street submitted final proposal revisions in June 2019. AR 7321.

On January 13, 2022, the GAO denied in part and dismissed in part Second Street's protests. AR 7883–913. The GAO dismissed as untimely Second Street's argument that GSA failed to reasonably consider the impacts of the pandemic on the Government's requirements, reasoning that the "vast majority" of the materials cited by Second Street dated from before August 2021, months before its protest. AR 7890. Moreover, it noted that Second Street did not allege the Government's requirements actually changed, only that GSA should have considered whether these impacts resulted in changed requirements. AR 7890–91. The GAO also rejected Second

Street's argument that GSA waived or relaxed the "occupancy date" requirement by allowing CJN to build a facility that would be ready for occupancy in 2025.  It found CJN's proposed occupancy date complied with the RLP, which required, "in accordance with the schedule outlined in the Schedule for Completion of Space paragraph," that space provided through new construction be "ready for use not later than 1,060 Working days following Lease Award."  AR 7892; *see* AR 884. The GAO also found that GSA made a reasonably prompt award, notwithstanding the multiple protests, change in administration, and coronavirus pandemic.  AR 7894.

Further, the GAO rejected Second Street's price realism arguments because it held that the RLP did not require GSA to conduct a price realism analysis.  AR 7936.  Instead, the RLP provided only that the award would be made to the lowest priced technically acceptable offer and included a detailed present value price evaluation formula that did not include a price realism component. *Id.* (citing RLP 4.03(A), 4.09).  The GAO further held that even if section 570.306(b) of the General Services Administration Acquisition Manual ("GSAM")—Second Street's cited authority for the alleged price realism requirement—required a price realism analysis, Second Street was required to challenge such a patent omission in the RLP prior to award.  *Id.*

The GAO also rejected Second Street's argument that the RLP required GSA to increase CJN's price to account for the additional "holdover" rent that the Government must pay to stay in its current space until CJN's new space is finished in 2025.  AR 7906.  Second Street contended such costs fell under the RLP provision requiring GSA to account for "the cost of relocation of furniture, telecommunications, replication costs, and other move-related costs."  *Id.*  The GAO held that interpretating the provision to include holdover costs was unreasonable and unfair because, if Second Street were correct, then as the incumbent landlord Second Street's present value for the 15-year initial term would be compared to a longer present-value term for CJN—*i.e.*,

CJN's price would include costs for 15 years, *plus* the numerous months between award and proposed occupancy.  AR 7907.

As to the unequal discussions claim, the GAO concluded that "GSA appear[ed] to have provided Second Street with significantly more detailed discussions with regard to pricing than it provided to CJN."  AR 7909.  And while Second Street alleged that GSA impermissibly allowed CJN to submit an updated project schedule and evidence of conditional financing, the GAO reasoned that "the information requested was not to correct a deficiency or otherwise make CJN's previously submitted proposal technically acceptable, nor did it result in any change to the offeror's proposed price or compliance with the RLP's requirements."  AR 7910.  Instead, it found CJN's original project schedule was fully compliant with the RLP's occupancy date, and the original conditional financing documentation provided was sufficient for GSA to determine that CJN was financially responsible.  AR 7910–11.  The GAO also reasoned that communicating with an offeror concerning its responsibility does not constitute discussions, so long as the offeror does not materially change its proposal.  AR 7911.    Finally, the GAO determined that GSA did not hold unequal discussions when it allowed CJN to update its proposed design to comply with local historical preservation requirements.  AR 7912.  Section 5.01 of the RLP expressly contemplated that the ASO might be responsible for complying with such requirements after the submission of final offers.  *Id.*

     3.   <u>Present Protest</u>

On March 4, 2022, Second Street filed its eight-count complaint in this Court.  *See* Pls.' Compl., ECF No. 1.  Similar to the arguments previously brought before the GAO, Second Street alleges that: (1) CJN did not submit evidence of a "conditional commitment of funds" as required by section 3.06(C) of the RLP; (2) GSA unlawfully waived the "occupancy requirement" for CJN;

(3) GSA failed to exclude CJN for not timely submitting signatory authority and a SAM registration for its project partner company; (4) GSA's responsibility determination with respect to CJN was arbitrary and capricious; (5) GSA violated GSAM 570.306(b) by failing to conduct a price realism analysis; (6) GSA conducted an arbitrary price evaluation; (7) GSA's requirements must have changed in the intervening years and that the information included in the offerors' proposals was stale; and (8) GSA engaged in unequal discussions with CJN. *See generally id.*

Pursuant to the Court's scheduling order, the Government filed the Administrative Record on March 29, 2022, and the parties subsequently briefed cross-motions for judgment on the Administrative Record. At the same time it filed its dispositive motion, Second Street also moved to supplement the record with a declaration supporting its competitive prejudice and irreparable harm arguments. The Court held a hearing on the parties' pending motions on June 17, 2022. On August 23, 2022, Second Street filed a second motion to supplement the administrative record with a copy of a story published in a commercial real estate bulletin on August 19, 2022, reporting that CJN is currently seeking financing to build SEC's new headquarters building per the lease award.

## II.  LEGAL STANDARDS

### A.     Motions for Judgment on the Administrative Record

A motion for judgment on the administrative record pursuant to Rule 52.1 of the Rules of the United States Court of Federal Claims is "properly understood as . . . an expedited trial on the record." *Bannum, Inc. v. United States*, 404 F.3d 1346, 1356 (Fed. Cir. 2005). The Court limits its review to the administrative record and "asks whether, given all the disputed and undisputed facts, a party has met its burden of proof." *Savantage Fin. Servs., Inc. v. United States*, 150 Fed. Cl. 307, 317 (2020) (citation omitted). In contrast to the standard for summary judgment, a genuine

issue of disputed fact does not prevent the Court from granting a motion for judgment on the administrative record.  *See Bannum*, 404 F.3d at 1357.

### B.      Lease Procurement Protests

The Court of Federal Claims evaluates lease procurement protests, as it does other bid protests, under the Administrative Procedure Act ("APA") standard of review.  *See Poplar Point*, 147 Fed. Cl. at 211; *see also* 28 U.S.C. § 1491(b)(4).  Pursuant to that standard, "an agency procurement action may be set aside only if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law.'"  *Savantage Fin. Servs.*, 150 Fed. Cl. at 317 (quoting 28 U.S.C. § 1491(b)(4) (adopting the standard of 5 U.S.C.§ 706(2)(A)); *see Ala. Aircraft Indus. v. United States*, 586 F.3d 1372, 1375 (Fed. Cir. 2009).

In conducting an arbitrary-and-capricious review, the Court may not substitute its judgment for that of the agency.  Even if the Court may have reached a different conclusion, it should not disturb the agency's decision "so long as there is a reasonable basis for it."  *Savantage Fin. Servs.*, 150 Fed. Cl. at 317 (citing *Honeywell, Inc. v. United States*, 870 F.2d 644, 648 (Fed. Cir. 1989)).  Accordingly, the Court's review of an agency procurement decision is "highly deferential."  *Advanced Data Concepts v. United States*, 216 F.3d 1054, 1058 (Fed. Cir. 2000).  The disappointed bidder "bears a heavy burden," and the contracting officer is "entitled to exercise discretion upon a broad range of issues."  *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001) (citations and internal quotation marks omitted).  This burden "is not met by reliance on [the] pleadings alone, or by conclusory allegations and generalities."  *Bromley Contracting Co. v. United States*, 15 Cl. Ct. 100, 105 (1988); *see Campbell v. United States*, 2 Cl. Ct. 247, 249 (1983).

Under this highly deferential review, an "award may be set aside if either: (1) the

procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure." *Glenn Def. Marine (Asia), PTE Ltd. v. United States*, 720 F.3d 901, 907 (Fed. Cir. 2013).   A procurement decision is rational if "the contracting agency provided a coherent and reasonable explanation of its exercise of discretion." *Impresa*, 238 F.3d at 1333.   "[T]hat explanation need not be extensive." *Bannum, Inc. v. United States*, 91 Fed. Cl. 160, 172 (2009) (citing *Camp v. Pitts*, 411 U.S. 138, 142–43 (1973)).   To prevail, a protestor also "must show a significant, prejudicial error in the procurement process." *WellPoint Mil. Care Corp. v. United States*, 953 F.3d 1373, 1377 (Fed. Cir. 2020) (quoting *Alfa Laval Separation, Inc. v. United States*, 175 F.3d 1365, 1367 (Fed. Cir. 1999)).   A protestor establishes prejudice by showing "that there was a substantial chance it would have received the contract award but for that error." *Alfa Laval*, 175 F.3d at 1367 (quoting *Statistica, Inc. v. Christopher*, 102 F.3d 1577, 1582 (Fed. Cir. 1996)).

Where a protest involves the interpretation of the terms of a solicitation, it presents a question of law.   *Banknote Corp. of Am., Inc. v. United States*, 365 F.3d 1345, 1353 (Fed. Cir. 2004).   As with matters of contract interpretation, the Court must give the text of the solicitation its plain and ordinary meaning.   *Id.*   It "must interpret [the solicitation] as a whole" and in a manner that gives reasonable effect "to all parts and avoids conflict or surplusage of its provisions." *Gardiner, Kamya & Assocs., P.C. v. Jackson*, 467 F.3d 1348, 1353 (Fed. Cir. 2006) (internal quotation marks and citation omitted).   An "interpretation that gives meaning to all parts of the [solicitation] is to be preferred over one that leaves a portion of the [solicitation] useless, inexplicable, void, or superfluous." *NVT Techs., Inc. v. United States*, 370 F.3d 1153, 1159 (Fed. Cir. 2004).

### III.  DISCUSSION

Second Street's protest raises a volley of challenges to the lease procurement at issue. Between these objections and the responses of the Government and CJN, the briefing before the Court presents an array of arguments—some posed in the alternative, many others arising tangentially.  This opinion is intended to focus on the arguments at the core of the parties' motions. For the reasons that follow, the Court determines that Second Street has failed to meet its burden on any of the asserted grounds of its protest.

### A.     The Court Has Jurisdiction Over Second Street's Protest.

The Court begins, as it must, with the question of jurisdiction.  Here, the question is not disputed.  To come within the Court's bid protest jurisdiction under 28 U.S.C. § 1491(b)(1), the plaintiff must establish that it has standing as an "interested party"—*i.e.*, that it is "an actual or prospective bidder[] or offeror[]" and has a "direct economic interest [that] would be affected by the award of the contract or by failure to award the contract."  *Rex Serv. Corp. v. United States*, 448 F.3d 1305, 1307 (Fed. Cir. 2006) (emphasis omitted) (citation omitted).  "In post-award protests, a plaintiff has standing where it would have had a 'substantial chance' of winning the award 'but for the alleged error in the procurement process.'"  *Pro. Serv. Indus., Inc. v. United States*, 129 Fed. Cl. 190, 201 (2016) (quoting *Info. Tech. & Applications Corp. v. United States*, 316 F.3d 1312, 1319 (Fed. Cir. 2003)).

Second Street easily meets the standing requirements to invoke the Court's jurisdiction. *See Croman Corp. v. United States*, 106 Fed. Cl. 198, 214 (2012), *aff'd*, 724 F.3d 1357 (Fed. Cir. 2013) (finding that in a post-award protest the court analyzes alleged prejudice twice—first through a limited review to ensure the minimum requirements of standing are met and then "more thoroughly" on the merits to determine whether relief is warranted).  As the incumbent landlord

and an actual (and only other remaining) bidder under the RLP whose direct economic interest would be affected by the award of the lease to CJN, it unarguably qualifies as an interested party for purposes of the threshold jurisdictional question.

**B.**   **GSA Did Not Arbitrarily or Capriciously Determine that CJN Provided Satisfactory Evidence of a Conditional Commitment of Funds.**

In Count I, Second Street argues that CJN did not provide a conditional commitment of funds as required by section 3.06(C) of the RLP.  Pls.' Mem. in Supp. of Mot. J. on Admin. R. at 10, ECF No. 27.  It notes that CJN's original proposal contained no financing information.  *Id.* at 10–11 (citing AR 1056, 2701).  And while CJN's revised proposal, dated January 25, 2019, purported to provide sufficient documentation of CJN's conditional financing, Second Street argues that the only "evidence" submitted consisted of "nonbinding, general term sheets from three banks and a one-page expression of potential interest from a fourth." *Id.* at 11.  These submissions came from [Bank #1], [Bank #2], [Bank #3], and [Bank #4].  *Id.* (citing AR 6746, 6760, 6762, 6768).  Second Street emphasizes that each document stated it was "for discussion purposes only," "without a conditional commitment[]," and "failed to include each of the minimum terms required." *Id.*

Second Street further points to the fact that, even after GSA sought to confirm the availability of CJN's funding prior to awarding the lease, CJN's updated term sheet from [Bank #1] and letter from [Bank #2] still failed to satisfy the RLP's requirements.  *Id.* at 12 (citing AR 6738, 6743); *see* Pls.' Reply in Supp. of Mot. for J. Admin. R. at 6, ECF No. 39.  Because CJN's financing documents were purportedly inadequate, Second Street contends that GSA should have found CJN's proposal to be technically unacceptable or, alternatively, amended the RLP to strike the requirements of RLP 3.06(C).  ECF No. 27 at 12–13.

Alternatively, in Count IV, Second Street argues that if these deficiencies did not result in CJN's proposal being technically unacceptable, then they should have led GSA to find that CJN was not presently responsible. *Id.* at 27. Viewed through this lens, Second Street argues that the RLP's requirements for financing constitute definitive responsibility criteria. *Id.* (citing *News Printing Co. v. United States*, 46 Fed. Cl. 740, 746 (2000)).

The Government and CJN disagree, arguing that the submissions cited by Second Street were, in fact, "satisfactory evidence of at least a conditional commitment of funds." Def.'s Cross-Mot. for J. Admin. R. & Opp'n to Pls.' Mot. for J. Admin. R. at 24, ECF No. 30 (quoting RLP 3.06(C)); *see* Def.-Intv.'s Cross-Mot. for J. Admin. R. & Opp'n to Pls.' Mot. for J. Admin. R. at 13, ECF No. 31. The Government contends that the CO reviewed the terms of each bank submission, exercised additional due diligence in requesting updated financing information, and reasonably concluded (twice) that CJN would "be able to obtain debt and equity financing in an amount large enough to cover all costs associated" with delivering the proposed space. ECF No. 30 at 23 (quoting AR 6589); *see id.* (citing AR 6737). It also posits that section 3.06(C) of the RLP did not, as Second Street claims, include "mandatory minimum requirements" such that a failure to comply would result in elimination from the competition. Def.'s Reply in Supp. of Cross-Mot. for J. Admin. R. at 8–9, ECF No. 40. Rather, the provision stated factors to be evaluated by the CO in making a responsibility determination and explicitly afforded the CO discretion to determine whether an offeror's evidence of conditional financing was satisfactory.[4] *Id.* at 9–10.

RLP 3.06(C) instructed offerors to provide with their proposals:

---

[4] CJN similarly takes issue with Second Street's characterization of RLP 3.06(C). It argues that the RLP did not require that an offeror's conditional commitment of funds be binding or even express. ECF No. 31 at 14.

Satisfactory evidence of at least a conditional commitment of funds in an amount necessary to prepare the Space (including base building, warm lit shell, and Tenant Improvement Allowance) and satisfactory evidence that Offeror's lender and all equity partners have approved the offered lease terms.  Such commitments shall be signed by an authorized bank officer, or other legally authorized financing official, dated within 10 days of the date of submission of Offeror's proposal, and at a minimum shall state: amount of loan, percentage of loan to project cost, term in years, annual percentage rate, length of loan commitment, name of the Principals(s) involved, the purpose of the loan, and the lender's approval of the offered lease terms.  In addition, Offeror must identify with specificity satisfactory to the LCO [Lease Contracting Officer] all information regarding proposed debt, as well as the total amount of equity invested in the building or project and its sources and applications, and provide evidence that all equity investors have approved the offered lease terms.

AR 292.  Pursuant to section 2.10(B)(1) of the lease, evidence of "[a] firm commitment of funds in an amount sufficient to perform the work" was due within 10 days after the lease award.  AR 317.

Even accepting arguendo Second Street's characterization of RLP 3.06(C) as setting forth mandatory requirements that if not complied with required exclusion, the record demonstrates that CJN provided sufficient evidence of a conditional commitment of funds.  At the very least, CJN's first letter from [Bank #1] (one of four such bank letters CJN submitted), contained the information identified in section 3.06(C) and was submitted to the CO as part of CJN's revised proposal.  AR 2719–25.  This seven-page letter included the signature of an authorized bank officer, Senior Vice President [. . .].  AR 2725.  The document, entitled "Summary of Terms and Conditions," was dated January 23, 2019, which was within 10 days of the submission of CJN's revised proposal on January 25, 2019.  AR 2719.  It included the amount of the loan, $625 million.  *Id.*  It stated the percentage of loan to project cost, 75 percent of the budget and/or 65 percent of the stabilized appraised value of the project.  *Id.*  It included the term of years, initially five.  AR 2720.  It stated the annual percentage rate, 6.25 percent.  AR 2719.  It stated the length of the loan commitment, 30 years.  *Id.*  It gave the names of the principals involved: [Bank #1] as administrative agent, lead

arranger and book runner, and lender (together with "a syndicate of other institutions arranged by" [Bank #1]). *Id.* It listed the borrower as a single purpose "entity managed by an affiliate of Douglas Development Corporation," *id.*, and further identified Norman Jemal and Douglas Jemal as guarantors, AR 2721. The purpose of the financing also was plainly laid out. AR 2719 ("Construction financing for a two-tower, eleven story trophy office building located at 60 New York Avenue NE, Washington, DC as a new headquarters building for the [SEC] . . . ."). Lastly, the term sheet addressed the lender's approval of the offered lease terms. AR 2720. Especially considering that the CO expressly retained the discretion to determine whether a proposal included "satisfactory evidence" of a conditional commitment of funds, Second Street has failed to show that CJN failed to submit such evidence in accordance with the RLP.

That the [Bank #1] term sheet indicated it was "for discussion purposes only" and "[did] not represent a commitment to lend" is of no matter. AR 2719. The binding commitment of funds seemingly contemplated in Second Street's first count was not required by section 3.06(C) of the RLP, which required only a *conditional* commitment at the time of the proposal. AR 292. Again, solely looking at the [Bank #1] term sheet, CJN submitted evidence explicitly setting forth various "Terms and Conditions" "for which a loan facility may be presented for credit approval." *Id.* In other words, it documented [Bank #1]'s approval of a loan amount to fund the proposed project, subject to the various conditions outlined in the letter and the parties' agreement on the final terms of any loan documentation. This was sufficient to create a conditional commitment. *See Solaria Corp. v. United States*, 123 Fed. Cl. 105, 116 (2015), *aff'd*, 671 F. App'x 797 (Fed. Cir. 2016) (holding that a conditional commitment letter was not a binding loan agreement but rather "only bound [the lender] to negotiate a potential loan agreement, subject to Plaintiffs' fulfillment of certain conditions"); *see also Runnemede Owners, Inc. v. Crest Mortg. Corp.*, 861 F.2d 1053, 1056

(7th Cir. 1988).  By contrast, a "firm"—*i.e.*, binding—commitment of funds was not required until after the lease award, as provided in section 2.10(B)(1) of the lease.  AR 317.  Reading a more definite level of commitment into RLP 3.06(C) would render the language in 2.10(B)(1) nugatory.  *See Info. Sys. & Networks Corp. v. United States*, 68 Fed. Cl. 336, 342 (2005) (citing *United States v. Johnson Controls, Inc.*, 713 F.2d 1541, 1555 (Fed. Cir. 1983)).

Regardless, as Second Street's fourth count acknowledges, whether an offeror has "adequate financial resources to perform the contract, or the ability to obtain them" is typically considered a matter of responsibility.  ECF No. 27 at 27 (quoting Federal Acquisition Regulation "FAR" 9.104-1(f)); *see id.* at 14.  A contracting officer's responsibility determination is "of necessity a matter for business judgment," and one in which he or she wields "broad discretion."  *News Printing*, 46 Fed. Cl. at 746.  Second Street argues that its challenge nonetheless states a viable protest ground, even under the lens of responsibility, because RLP 3.06(C) stated special standards or definitive responsibility criteria that could not be waived by the CO.  ECF No. 27 at 14 (citing *John C. Grimberg Co. v. United States*, 185 F.3d 1297, 1302 (Fed. Cir. 1999)); *see id.* at 27.  According to Second Street, "the Government conflates the financing aspect of the CO's responsibility determination with the specific RLP requirement of a 'conditional commitment of funds.'"  ECF No. 39 at 6.

To the contrary, it is Second Street that attempts to elevate certain objective items of information over what is expressly and inherently a subjective determination.  The same conclusion was reached in *News Printing*, on which Second Street relies.  In that case, the solicitation required offerors to submit certain information evidencing their ability to perform the contract at issue.  *News Printing*, 46 Fed. Cl. at 747 (requiring submission of a quality assurance program ("QAP") that addressed a minimum of seven elements).  The court held that this

requirement did not state a special standard or definitive responsibility criteria because, although the QAP was "subject to objective inquiry, . . . the objectivity end[ed] there."  *Id.*  The determination of whether the plan addressed the objective elements required was "plainly one that is inherently subjective."  *Id.*

The same can be said here.  As the Government correctly observes, RLP 3.06(C) related to the discretionary question of financial responsibility and explicitly afforded the CO discretion in determining whether an offeror's proposal contained "satisfactory evidence" of a conditional financing commitment.  ECF No. 40 at 9 (quoting AR 292); *see John C. Grimberg*, 185 F.3d at 1303 (holding that "the contracting officer is the arbiter of what, and how much, information he needs" to make a responsibility determination).  The RLP did not identify the information to be included in the offerors' commitments as special standards, nor did it advise offerors of any adverse consequences of failing to provide any item of information.  *See John C. Grimberg*, 185 F.3d at 1301 ("To ensure fairness to all contractors, . . . special standards must be identified as such in the bid solicitation . . . .").

Here, CJN provided submissions from three banks proposing terms and conditions for potential loans ranging from $575 to $625 million and a letter from a fourth bank expressing interest in lending $690 million for the project.  Consistent with the above discussion, at the very least, the [Bank #1] submission addressed the items of information enumerated in RLP 3.06(C).  The CO's first financial responsibility memorandum expressly stated that he reviewed CJN's conditional financing evidence and concluded CJN "could obtain debt and equity financing in an amount large enough to cover all costs associated with delivering [the project] in accordance with the Lease and RLP."  AR 6589.  Given the time that had elapsed between his initial memorandum and lease execution, the CO reasonably obtained updated evidence of conditional financing from

CJN and affirmed his financial responsibility determination.  AR 6589, 6737.  The Court finds the CO's consideration of CJN's evidence was not arbitrary and capricious and that CJN provided sufficient information for the CO to reasonably conclude that CJN was financially responsible. Second Street's contrary arguments essentially challenge the CO's weighing of the evidence, but mere disagreement with his evaluation is insufficient to show it lacked a rational basis.  *See Sci. Applications Int'l Corp. v. United States*, 108 Fed. Cl. 235, 248 (2012).

**C.     GSA Did Not Waive the Occupancy Date Requirement for CJN.**

Second Street contends that the RLP contained a required occupancy date in the "2nd/3rd Quarter of 2023."  ECF No. 27 at 15 (quoting AR 446).  Although this date range was found only on the cover page of the RLP and was expressly identified as an estimate, Second Street argues it clearly defined the "<u>required</u> timeframe for occupancy" when read in conjunction with other RLP provisions.  *Id.*; *see id.* at 15–16 (citing AR 450–52, 466) (noting that the phrase "required occupancy date" is found throughout the RLP).  According to Second Street, GSA waived this requirement for CJN, whose current construction schedule projects an occupancy date of October 2025.  AR 8256–58.

The Government and CJN argue that the RLP's lone reference to the 2nd/3rd Quarter of 2023 "estimated" occupancy date cannot be read as a requirement to which proposals were to conform.  ECF No. 30 at 28; ECF No. 31 at 17.  Both state that the actual requirement for occupancy was unambiguously set forth in section 1.02(G) of the RLP, which incorporated by reference the completion of space schedule provided in section 4.01(J) of the lease.  *Id.*

Second Street's claim raises a question of law regarding the proper interpretation of the RLP.[5]   The same rules of contract interpretation apply to interpretations of government solicitations.  *Safeguard Base Operations, LLC v. United States*, 989 F.3d 1326, 1344 (Fed. Cir. 2021).  The Court must therefore begin with the text of the RLP, which is plain and unambiguous. *See Banknote Corp. of Am.*, 365 F.3d at 1353 (holding that a term "is ambiguous only if its language is susceptible to more than one reasonable interpretation").  The RLP specifically defined the required occupancy date in section 1.02(G), which stated: "Occupancy is required in accordance with the schedule outlined in the Schedule for Completion of Space paragraph under the Lease."  AR 279.  That provision of the lease, in turn, required offerors to complete all work to prepare the space within 330 working days of the NTP, unless the space in question was new construction, in which case they would have 1,060 working days from the lease award date.  AR 884.   It is undisputed that CJN's construction schedules (original and updated) proposed occupancy within this timeframe.

Contrary to Second Street's contention, reading the cover page's occupancy date estimate as a requirement is not a reasonable interpretation of the RLP.  Indeed, date-certain occupancy would be at odds with the way the lease calculated the completion schedule, which tied the timeframe for occupancy to either the date of NTP or the lease award (depending on the type of project selected).[6]  The more natural understanding—and one that is consistent with the RLP as a

---

[5] For this reason, it does not matter if the Court views the occupancy date as a matter of technical acceptability under Count II or responsibility under Count IV.  *See* ECF No. 27 at 21; ECF No. 39 at 18.

[6] Calculating the occupancy date by reference to certain project milestones also made sense, given that the RLP contemplated offerors' proposing new construction.  Meeting occupancy by a date-certain (or within a three month range) would make it significantly harder for new construction offerors to compete.  Indeed, as CJN observes, to meet a September 30, 2023, move-in date, GSA would have had to issue the NTP or lease award no later than June 18, 2019, which

whole—is that the "2nd/3rd Quarter of 2023" represented GSA's best estimate at the time of the proposal of when occupancy should occur under the schedule provided in section 4.01(J) of the lease, assuming a prompt award.  This interpretation is also consistent with the fact that the estimated occupancy date range was provided on the RLP's cover page.  It did not purport to impose a requirement of the RLP because it was not actually part of the RLP.  *See* ECF No. 40 at 14 (citing RLP 1.06, "List of RLP Documents," which did not include the cover page).

Second Street acknowledges that the RLP and lease "allow[] the eventual awardee adequate flexibility in the *actual timing of performance*."  ECF No. 39 at 15 ("[T]he required performance durations do not commence until the NTP is issued (ensuring that awardee has adequate time to perform, despite any procurement delays that might arise).").  It argues, however, that the RLP required that "all offerors *propose and price the same [occupancy] timeframe*" (*i.e.*, 2nd/3rd Quarter of 2023) to ensure a fair apples-to-apples evaluation of offers.  *Id.*  According to Second Street, any other interpretation would result in a scenario where "GSA would have no basis in the RLP to exclude an offeror proposing a 2030 occupancy."  ECF No. 27 at 20.  Since the schedule under the lease was triggered by one of two actions *taken by the Government*, it is unclear why GSA would not retain authority to reject a proposal that did not correspond with its own NTP or award timeline.

In any event, the proposed construction schedule on which GSA relied in selecting CJN as the ASO satisfied the 2023 deadline that Second Street advocates for here.  AR 2745 (revised proposal showing occupancy by December 2022); AR 1118 (initial proposal showing occupancy by December 2022).  Therefore, the apples-to-apples comparison that Second Street claims was

---

was three days before CJN and Second Street submitted their final proposal revisions.  Def.-Intv.'s Reply in Supp. of Cross-Mot. for J. Admin. R. at 10, ECF No. 41.

required was in fact performed. *See* ECF No. 27 at 20; ECF No. 39 at 15. The construction schedules that Second Street alleges were non-compliant were provided by CJN after GSA identified CJN as the ASO in March 2020. AR 6586 (updated schedule dated June 1, 2020, showing occupancy by July 2024); AR 8258 (updated schedule dated July 19, 2021, showing occupancy by October 2025). Accordingly, Second Street's occupancy date claim is without merit.

### D.   GSA Did Not Arbitrarily and Capriciously Determine That CJN Provided Sufficient Evidence of Signatory Authority and SAM Registration.

Second Street argues that CJN's proposal did not comply with the RLP because it did not provide evidence that CJN had the requisite authority to bind all owners of the property being offered and because it failed to submit a SAM registration for Cayre Jemal's Gateway, LLC ("CJG"). ECF No. 27 at 22. CJG is a separate, but affiliated, entity that owns one of the parcels of land on which CJN proposed to build SEC's new headquarters. AR 8268, 8270–78. Second Street notes that RLP 3.06(I) required offerors to have "an active registration in the System for Award Management (SAM) . . . prior to final proposal revisions," AR 292, and claims that CJG, as a partial owner of the offered property, was thus required to have a SAM registration. ECF No. 27 at 26. It also contends that CJN failed to provide evidence in support of its final revised proposal establishing that CJN had authority to bind CJG, as was required by section 3.06(A) of the RLP. *Id.* at 24–26. Having failed in these respects, Second Street contends that CJN should have been found ineligible for the award or, alternatively, not responsible. *Id.* at 26–27, 29.

The Government and CJN argue that CJN sufficiently demonstrated at the proposal stage CJN's authority to contractually bind CJG regarding the project. ECF No. 30 at 25; ECF No. 31 at 19. They also argue that CJN's SAM registration alone satisfied RLP 3.06(I). *Id.* As CJN

emphasizes, RLP 3.06(I) only required the offeror—not the owner(s) of the property—to provide proof of SAM registration.  ECF No. 31 at 21.

The Government and CJN have the correct understanding of the RLP's requirements.  First, RLP 3.06(I) plainly required the offeror, not all parties with ownership interests in the proposed property, to provide proof of an active SAM registration prior to final proposal revisions.  AR 292. The RLP did not require that the offeror be the owner of the property.  *Id.*  Rather, RLP 3.06(A) specifically contemplated an offer being submitted *on behalf of an ownership entity*, so long as the offeror provided authorization from that entity.  *Id.*  Second Street's reading presupposes that such an offeror acting on another's behalf could only be a "non-fee owner offeror," and that, when read in conjunction with the requirement that the lessor be the fee owner of the property, the RLP required all ownership entities to serve as offerors (and lessors) in their own right.  ECF No. 39 at 19–20.  As the Government correctly observes, that is not what the RLP said.  *See* ECF No 40 at 19.  Nothing in the RLP required that all entities with ownership interests in the property proposed be listed as offerors.  Nor did it prohibit one ownership entity from serving as offeror for both itself and a separate ownership entity.

Here, CJN—as the sole offeror of the final proposal and the lessor on the executed lease— timely submitted proof of its active SAM registration.  *See* AR 6146, 6235, 6776.  It thus fully complied with RLP 3.06(I).[7]

Second, as the record demonstrates, the information that CJN provided to GSA accurately identified CJN's and CJG's ownership interests and sufficiently demonstrated CJN's authority to act on behalf of CJG pursuant to RLP 3.06(A).  Specifically, the materials showed that the site

---

[7] Because Second Street's claim fails as a matter of law based on an interpretation of the RLP, it does not matter if the Court views the SAM registration requirement as a matter of technical acceptability under Count III or responsibility under Count IV.

offered by CJN is comprised of two different parcels, Square 669 and Square 670.  AR 1157 (picture showing the boundaries of the two squares).  Tax documents showed that the two squares are owned by separate entities: one parcel owned by CJN, the other by CJG.  AR 1063, 1158–1228.  Indeed, CJG submitted the initial proposal itself and included a copy of its deed for Square 669.  AR 1063, 1248–49.  The revised proposal clarified that CJN was the "correct offering entity" and that "the appropriate signatories for all partners behind [CJN] have reviewed the offer documentation and designated Norman Jemal as the signatory for this offer."  AR 2707.  It also provided proof of signatory authority, which demonstrated that the members of CJG authorized the submission of a proposal to GSA in response to the RLP and appointed Norman Jemal as authorized agent of CJG for purposes of signing any documents in connection with the proposal.[8] AR 2743.  Further, in preparation for executing the lease, CJN provided GSA with a joint authorization and confirmation document dated June 22, 2020, affirming that CJN "ha[d] been and [would] continue to be fully authorized to act in its own name on behalf of both [CJN and CJG]" as it related to the proposal, any negotiations with GSA, and "entering into a lease with the GSA as a result of the proposal and RLP."  AR 8240 (ratifying and confirming "all actions that have been taken to date by [CJN]").

The CO reasonably relied on CJN's and CJG's representations regarding signatory authority.  *See Allied Tech. Grp., Inc. v. United States*, 649 F.3d 1320, 1330 (Fed. Cir. 2011) (citing *Centech Grp., Inc. v. United States*, 554 F.3d 1029, 1039 (Fed. Cir. 2009)).  The Court sees no reason based on the face of CJN's proposal and supporting documentation, nor has Second Street provided sufficient evidence, to conclude otherwise.  Moreover, the Court agrees with the

---

[8] Normal Jemal acted as an authorized agent of CJG in the initial proposal and is part-owner of the company that serves as a co-managing member of CJN.  AR 1259, 8277.

Government and CJN that the signatory authority requirement related to the discretionary question of responsibility. *See* ECF No. 30 at 28; ECF No. 31 at 20. RLP 3.06(A) required in general terms submission of "authorization from the ownership entity to submit an offer" at the proposal stage. AR 292. Second Street may believe the evidence of authorization was slim at the time of proposal, or fault GSA for not obtaining additional information confirming CJN's signatory authority until a year after it had selected CJN as the ASO, but these disagreements do not present successful grounds for a protest. *See Sci. Applications*, 108 Fed. Cl. at 248. Consequently, Second Street's claim must fail.

### E. Second Street Fails to Show that GSA Violated GSAM 570.306(b) by Failing to Conduct a Price Realism Analysis.

Second Street argues in its fifth count that GSA violated GSAM 570.306 by failing to conduct a price realism analysis. According to Second Street, GSAM 570.306(b) mandates such analysis because it instructs contracting officers in GSA leasehold acquisitions to ensure the elements of the proposed rent are "realistic and reflect the offeror's clear understanding of the work to be performed." ECF No. 27 at 29; *see* ECF No. 39 at 25. Second Street contends that, had GSA conducted a price realism analysis, it would have resulted in an increase in CJN's proposed pricing. ECF No. 27 at 30.

The Government and CJN contend that any price realism challenge is waived because Second Street should have timely raised its objection prior to the lease award. ECF No. 30 at 33; ECF No. 31 at 26. Regardless, they claim that the GSAM did not require GSA to conduct a price realism analysis. *Id.* The Government and CJN point out that pursuant to GSAM 570.306(a) "contracting officer[s] must evaluate offers solely in accordance with the factors and subfactors stated in the SFO [solicitation for offers]," and here the RLP required only a present value price evaluation. ECF No. 30 at 33–34; *see* ECF No. 31 at 26. Indeed, the Government contends it

would have been reversible error for GSA to base its award decision on a price realism analysis, as it would have constituted unstated evaluation criteria.  ECF No. 40 at 21.

Even assuming arguendo that Second Street's challenge is timely and that GSA had an obligation under GSAM 570.306(b) to analyze whether CJN's proposed rent was realistic regardless of the terms of the RLP, Second Street's claim nonetheless fails.  This is apparent based on a plain reading of what the GSAM provision requires GSA to do.[9]  GSAM 570.306(b) begins by directing contracting officers to "[e]valuate prices and document the lease file to demonstrate that the proposed contract price is fair and reasonable."  *Id.*; *see* 48 C.F.R. § 570.306(b) (including identical provision in the General Services Acquisition Regulation ("GSAR")).[10]  There is no dispute that GSA determined CJN's price proposal was fair and reasonable.  *See* AR 6734.  The very next sentence directs contracting officers "to analyze whether the individual elements [of the proposed rent] are realistic and reflect the offeror's clear understanding of the work to be performed."  GSAM 5701.306(b).  This latter language is substantially like the FAR's definition of cost realism.  *See* FAR 15.404-1(d)(1) ("Cost realism analysis is the process of independently *reviewing and evaluating* specific *elements of each offeror's proposed cost estimate* to determine *whether the estimated proposed cost elements are realistic* for the work to be performed . . . [and] *reflect a clear understanding of the requirements* . . . ." (emphasis added)).

---

[9] The parties have not cited, nor could the Court locate, any cases interpreting GSAM 570.306(b).

[10] The GSAR is incorporated in its entirety into the GSAM.  GSAM 501.170(a).  The GSAM "consolidates [GSA's] agency acquisition rules and guidance and presents them in one document to eliminate the burden of checking multiple sources," *United States ex rel. Morsell v. Symantec Corp.*, 471 F. Supp. 3d 257, 268 (D.D.C. 2020), and thus this opinion cites primarily to the GSAM for ease of reference.

The final sentences of subsection (b) explain what the contracting officer should do based on the results of the analysis. Specifically, he or she must discuss any "inconsistencies" with the offeror; and "[i]f the offeror refuses to support or make any changes to the rent proposed," he or she must "consider the risk to the Government prior to making any lease award." GSAM 570.306(b). This language also mirrors the FAR's cost realism provision, which states that such analysis "may be used in performance risk assessments and responsibility determinations" but "the offered prices shall not be adjusted as a result of the analysis." FAR 15.404-1(d)(3). In that respect, it supports the Government's argument that GSAM 570.306(b) relates to the CO's discretionary responsibility determination, not price adjustment or exclusion. *See* Hr'g Tr. at 94:22–95:4; *see also Possehn Consulting*, B- 278579, 1998 WL 6944, at *2 (Comp. Gen. Jan. 9, 1998) ("A determination that an offeror's price on a fixed-price contract is too low generally concerns the offeror's responsibility, *i.e.*, the offeror's ability and capacity to successfully perform the contract at its offered price.").

Accordingly, under GSAM 570.306(b), the CO would have been required to review and analyze whether the elements of CJN's proposed rent were realistic and clearly reflected that CJN understood the performance requirements. Further action would have been required only if he identified "inconsistencies" and if, following discussions, CJN refused to provide additional support for or lower its proposed rent. Contrary to Second Street's claim, CJN would not have been excluded nor would it its price necessarily have increased had the CO determined that CJN's proposed rent was unrealistic.

Although the parties have not pointed to anything in the Administrative Record that explicitly documents a "price realism analysis," the record shows that GSA reviewed and analyzed elements of CJN's proposed rent as part of its present value price analysis. AR 2663, 6093, 6244.

Second Street does not dispute that fact, nor does it contend CJN did not understand the work to be performed.  Instead, just as it does in the challenge to GSA's price evaluation (discussed further below), Second Street argues that GSA's analysis failed to flag what it contends were CJN's "unrealistically low" proposed operating expenses and real estate taxes.  ECF No. 27 at 30.  The CO, however, found CJN's proposed operating costs and real estate taxes to be consistent with both the market generally and the estimates submitted by Poplar Point, which also proposed new construction.  AR 7772–73.  Additionally, CJN's overall rental rate fell squarely within the agency's negotiating objectives, developed in consultation with GSA's broker following the performance of a market survey.  AR 7770–71.  In sum, the CO determined "there [was] no basis to conclude the project is not achievable at [CJN's] offered rates."  AR 7771.  The Court can thus discern GSA's decisional basis from the record, even if it was not expressly designated as the analysis called for by GSAM 570.306(b).  *See DynCorp Int'l, LLC v. United States*, 10 F.4th 1300, 1314–15 (Fed. Cir. 2021).  Having reviewed and analyzed the elements of CJN's proposed rent, and having identified no "inconsistencies," the GSAM required nothing more of the CO.

F.    **GSA Did Not Conduct an Arbitrary or Capricious Price Analysis.**

In Count VI, Second Street contends that GSA's price analysis was arbitrary and capricious in three ways.  First, it argues GSA relied on "stale" information in calculating move and replication costs associated with CJN's offer because GSA's price estimates were developed in 2016, while the estimates for certain expenditures to remain in the incumbent space were developed in 2018.  ECF No. 27 at 31–32.  Based on the passage of time and post-pandemic market conditions, Second Street argues that GSA was required to update these price estimates.  *Id.*  Second, it claims CJN proposed an unrealistically low base for real estate taxes and operating expenses.  *Id.* at 32.  Third, Second Street contends that GSA improperly excluded holdover costs

that will result from it selecting a project that will not be completed until October 2025, well after the original estimated occupancy date (2nd/3rd Quarter of 2023) and the expiration of SEC's current leases (September 30, 2023).  *Id.* at 33.

Federal procurement entities have broad discretion in making contract award decisions. *Banknote Corp. of Am.*, 365 F.3d at 1355.  The Court's task is to determine whether the agency's evaluation and award decision has a rational basis and does not violate any statutory or regulatory requirements, prohibitions, or standards.  *Savantage Fin. Servs., Inc. v. United States*, 595 F.3d 1282, 1285–86 (Fed. Cir. 2010).

1.    GSA's Cost Estimates

As the Government and CJN correctly note, Second Street fails to identify any statutory or regulatory provision (or other authority) that required GSA to update its cost estimates in the period between final proposal revisions and award.  *See* ECF No. 30 at 35; ECF No. 31 at 27.  Speculative contentions that the 2016 and 2018 estimates were outdated does not suffice to overcome Second Street's "heavy burden" in this protest.  *MSC Indus. Direct*, 140 Fed. Cl. at 641.  Considering the high degree of deference owed, the Court cannot second-guess GSA's judgment to proceed with the procurement as planned, especially where Second Street offers virtually no legal argument or factual support for its objection.

Indeed, there seems nothing inherently irrational about the course GSA charted here. GSA's evaluation of the parties' final proposal revisions submitted in June 2019 and selection of CJN as the ASO in early March 2020 occurred prior to the onset of pandemic-related restrictions in the National Capital Region.  Of course, the award was delayed until September 2021 for a variety of reasons.  But, as the Government aptly notes, the procurement at issue is a fixed-price contract, and thus CJN (not the Government) bears the risk of any actual increased performance

costs due to these unforeseen circumstances.  *See* ECF No. 40 at 21 (citing *Agility Def. & Gov't Servs., Inc. v. United States*, 115 Fed. Cl. 247, 252 (2014)).

Even if there were some merit to Second Street's claim, the Court agrees with the Government that this is an untimely objection.  *See* ECF No. 30 at 35 (citing *Blue & Gold Fleet, L.P. v. United States*, 492 F.3d 1308, 1313 (Fed. Cir. 2007); *COMINT Sys. Corp. v. United States*, 700 F.3d 1377, 1382 (Fed. Cir. 2012)).  Second Street had ample time from March 2020 until September 2021 to raise any concerns about "stale" cost estimates.  Indeed, it represented in its October 2021 debriefing request to GSA that it had been "anticipating an RLP amendment based on the significant passage of time since [final proposal revisions] were submitted, COVID-19 impacts, increased construction costs, labor shortages, and changes in Government space needs and/or telecommute policies."  AR 6964.  Assuming this rendered the price analysis methodology defective, Second Street had knowledge of the alleged defect and could not silently wait to learn of the outcome of the procurement before asserting its challenge.  *See COMINT Sys. Corp.*, 700 F.3d at 1382 (quoting *Blue & Gold*, 492 F.3d at 1313).  Accordingly, the argument is waived.

> 2.   CJN's Proposed Real Estate Tax Base and Operating Expenses

The objection concerning CJN's proposed real estate tax base and operating expenses likewise fails.  Specifically, Second Street argues that CJN's proposed tax base of $[. . .]/RSF and operating costs of $[. . .]/RSF were unrealistically low, especially in comparison to Second Street's proposals which were based on actual figures.  ECF No. 27 at 32 (highlighting Second Street's proposed tax base of $[. . .]/RSF and operating costs of $[. . .]/RSF).

As with its other claims, Second Street does not provide any factual or legal support for its contention that CJN's price proposal was unrealistic.  Nor does the record demonstrate that GSA's price evaluation lacked a rational basis.  GSA's basic present value analysis shows that the CO

reviewed CJN's price proposal (including elements of the proposed rent) consistent with the evaluation methodology provided in the RLP to arrive at the present value of its offer.  AR 6244–48, 6732–33.  The CO determined that CJN's proposed real estate tax base "was reasonable and consistent with real estate taxes in the market."  AR 7772.  He found CJN's proposed operating costs to be "in line with [his] analysis of the market, the established market objectives," "the other new construction's [Poplar Point's] offered operating cost base," and "operating costs proposed in other recent GSA procurements for which [he has] been the CO."  *Id.*  This conclusion is supported by materials in the record, including the CO's price evaluation memorandum.  AR 6722–23, 6732–33.

That CJN's proposed tax base and operating costs were lower than Second Street's does not undercut the CO's analysis or conclusion.  Second Street and CJN proposed fundamentally different projects.  One involved an existing space that currently serves as the SEC's headquarters, the other new construction.  One would expect the pricing for such distinct proposals to be different and for CJN to base its proposal on projections rather than figures from prior years (like Second Street did).  Second Street may take a different view of what would be realistic, but the Court cannot substitute its judgment (nor Second Street's) for that of the agency.

3.   Holdover Costs

Second Street's third objection is defeated by the plain language of the RLP.  It argues that GSA improperly excluded critical and inevitable holdover costs in evaluating CJN's price proposal.  ECF No. 27 at 33.  According to Second Street, because GSA did not hold CJN to the alleged 2nd/3rd Quarter of 2023 occupancy date requirement, the SEC will incur holdover costs at the incumbent space that properly should have been accounted for in GSA's price evaluation.  *Id.*  It does not identify a particular term of the RLP that supports such argument but does refer to

GSA's "analysis of move-related and replication costs," *id.*, which is addressed in section 4.09(C)(7)(e) of the RLP.

For purposes of calculating the present value of CJN's offer, this provision required GSA to add "[t]he cost of relocation of furniture, telecommunications, replications costs, and other move-related costs, if applicable," to the gross present value cost.  AR 298.  Holdover costs were not expressly mentioned in RLP 4.09 or any other part of the RLP.  Nor can the phrase "other move-related costs" be construed to contemplate holdover lease payments to Second Street as the incumbent landlord.  As the Government correctly notes, under basic principles of statutory construction, the Court determines the meaning of "other move-related costs" by reference to the list of items preceding it.  ECF No. 30 at 38 (citing *Avenues In Leather, Inc. v. United States*, 423 F.3d 1326, 1332 (Fed. Cir. 2005)).  This list—"relocation of furniture, telecommunications, [and] replications costs"—described costs associated with preparing a new space for the SEC to occupy and physically moving the SEC to that space.  A plain reading does not reasonably bear the interpretation Second Street asserts, which would include costs relating to the SEC remaining in the interim in its current space.

Second Street's argument also relies on the contention that GSA waived the alleged $2^{nd}/3^{rd}$ Quarter of 2023 occupancy date requirement with respect to CJN's proposal.  ECF No. 27 at 33.  It contends this alleged waiver resulted in, at a minimum, 10 months of holdover rental costs that were not accounted for in evaluating CJN's price.  *Id.*  As explained above, the RLP did not contain a date-certain occupancy requirement; rather, the occupancy timeframe was determined by the lease's Schedule of Completion of Space.  AR 332; AR 279.  The Court agrees with CJN that insofar as Second Street takes issue with the fact that the net present value price evaluation methodology set forth in the RLP did not address holdover costs, it presents an untimely challenge

to the terms of the RLP.  *See* ECF No. 31 at 28.  At some point in the four years between GSA's

issuing the RLP and awarding the lease to CJN, it became highly likely (indeed, inevitable) that

CJN's new construction project would not be completed by what Second Street considered to be

the required occupancy date.  *See* ECF No. 27 at 33.  Thus, its concern that the RLP's price

evaluation criteria failed to account for holdover costs that the SEC was almost certain to incur

was an objection it was required to assert prior to the award.  *See COMINT Sys. Corp.*, 700 F.3d

at 1382; *Blue & Gold*, 492 F.3d at 1313.

> **G.    GSA Did Not Violate GSAM 570.303-4.**

Second Street's seventh count argues that GSA violated GSAM 570.303-4 by failing to

cancel or reissue the RLP in light of changes to the SEC's requirements and various changes to

the labor and construction markets during the course of the procurement.  ECF No. 27 at 36.

Specifically, Second Street argues that because GSA defined its requirements "sometime in 2016,"

those requirements—and the offers themselves—were stale by the time GSA awarded the lease in

September 2021, over three years after issuing the RLP and over two years after receiving final

proposal revisions.  *Id.* at 37–38.  As evidence of changed requirements and circumstances, it cites

the SEC's long-running objections to the procurement and updated wage determinations issued in

June 2020.  *Id.* at 38–40, 43.  It also points generally to the impacts the coronavirus pandemic has

had on telecommuting policies, as well as inflation, the overall increase in material costs, labor

shortages, and supply chain delays.  *Id.* at 41.  In Second Street's estimation, " [i]t simply is not

feasible that the RLP . . . still accurately reflect[ed] SEC's current requirements."  *Id.* at 41.

As the Government and CJN correctly argue, Second Street has not shown that the

Government's requirements actually changed, and the Government represents that, in fact, they

have not.  ECF No. 30 at 41; *see* ECF No. 31 at 30.

The GSAM directs contracting officers to issue an amendment to a solicitation "[i]f the Government's requirements change, either before or after receipt of proposals."  GSAM 570.303-4(a).  "If an amendment is so substantial that it requires a complete revision of the SFO," GSAM instructs the contracting officer to "cancel the SFO, readvertise if required by 570.106, and issue a new SFO."  *Id.* 570.303-4(d).  "If there are changes to the Government's requirements for amount of space, delineated area, occupancy date, and/or other major aspects of the requirements, the contracting officer shall consider whether there is a need to readvertise, and to document the file accordingly."  *Id.* 570.303-4(e).  The Federal Circuit has made clear that the determination of an agency's needs "is a matter within the broad discretion of agency officials . . . and is not for [the] court to second guess."  *Savantage Fin. Servs.*, 595 F.3d at 1284 (quoting *Wit Assocs., Inc. v. United States*, 62 Fed. Cl. 657, 662 (2004)); *see id.* at 1286 ("[C]ompetitors do not dictate an agency's minimum needs, the agency does." (quoting *Savantage Fin. Servs., Inc. v. United States*, 86 Fed. Cl. 700, 706 (2009))).

Second Street relies primarily on the evidence documenting SEC's initial objections to the RLP.  In letters dated between July 2019 and November 2020, the SEC expressed its concerns to GSA that the RLP was "inconsistent with the needs and obligations of the SEC and is economically insufficient."  AR 8056.  These communications reflect that the chief dispute between GSA and the SEC involved the methodology the RLP used to evaluate the future purchase option.  *Id.*; AR 8062–64 (recommending restricting of purchase option); AR 8070 ("As we consistently have stated, our concerns are with the flawed structure and evaluation of aspects of the RLP, not with any particular offer . . . ."); AR 8072 (referring to "the various concerns we [the SEC] have raised with GSA about the adverse economic consequences of the novel purchase option included in the RLP since the option was added in February 2018.").  In November 2020, the inter-agency dispute

remained unresolved, and the SEC's Chairman proposed to GSA three potential paths forward. AR 8073–74. The third option included "reassessing the SEC's space needs," given that the passage of time and intervening events "could affect the agency's long-term space needs," and "resoliciting for a current, revised requirement." AR 8073. The Chairman noted that "[a] *very preliminary* assessment" conducted by SEC staff indicated "a *potential* reduction in space needs of at least 10 percent," which "*could* increase further *if* agency teleworking policies were expanded." AR 8074 (emphasis added). He further qualified that the SEC had done only "initial assessments" and not "a detailed revised Program of Requirements." *Id.* In a January 2021 letter to the SEC, GSA's Administrator responded to the SEC's notional concerns and concluded, "based on the current information at [the agency's] disposal," that GSA would not "cancel the existing procurement at this time." AR 8077.

The SEC's concerns do not carry Second Street's burden to show that GSA acted arbitrarily and capriciously by not resoliciting or amending the RLP. First, the SEC did not actually determine that its requirements changed. Rather, the SEC referenced only "initial estimates, potential reductions, and other intervening circumstances that *could* impact the SEC's space needs." *Id.* Moreover, the SEC specifically stated that it had not revised its Program of Requirements (*see* AR 9–129) and did not express an intention of doing so, citing the considerable time and resources it would involve. AR 8074. Second, GSA did not determine that any requirements of the RLP changed. And Second Street has not demonstrated that GSA—as the procuring agency with statutory leasing authority—acted arbitrarily and capriciously or abused its broad discretion in deciding to proceed with the procurement "based on the current information at [its] disposal," AR 8077, notwithstanding the SEC's "very preliminary" headcount estimate, AR 8074. Finally, regardless of its initial objections, the SEC (upon the change in administration)

ultimately signed the occupancy agreement, thus allowing GSA to finalize the lease with CJN.  AR 6593–99.

Nor is the Court persuaded that the mere passage of time alone or intervening market changes during the procurement are sufficient to presume a change of requirements in this case, or that such circumstances triggered an obligation by GSA as the procuring agency to re-evaluate the RLP's requirements.  Nothing in the plain text of GSAM 570.303-4 or the RLP would support this proposition.  Second Street relies on *DZSP 21, LLC v. United States*, 139 Fed. Cl. 110 (2018), but that case presented distinguishable facts and a distinguishable procurement.  ECF No. 27 at 36.  In *DZSP 21*, the source selection authority expressly acknowledged that the requirements of the solicitation at issue had changed, thus implicating the FAR's similar requirement to amend the solicitation.  139 Fed. Cl. at 115 (citing FAR 15.206(a)).  As a matter of administrative convenience, she decided to re-evaluate proposals instead.  *Id.*  Here, the CO made no such determination.  Indeed, the record shows that GSA was not convinced that any RLP requirements had changed.  AR 8077.  Apart from self-serving speculation, Second Street provides no evidence that the CO's decision to move forward with the RLP was "so plainly unjustified as to lack a rational basis."  *Savantage Fin. Servs.*, 595 F.3d at 1286.

In any event, the Court agrees that Second Street largely waived this challenge.  Second Street was necessarily aware of the time elapsing between the RLP and award, as well as the pandemic's impact on telecommute policies.  AR 6964.  Indeed, because of these circumstances, it was "anticipating an RLP amendment."  *Id.*  But as with its concerns about "stale" cost estimates and holdover costs, it could not simply hold its objection in reserve until it learned that its offer was unsuccessful.  *See COMINT Sys. Corp.*, 700 F.3d at 1382.  Thus, it waived its right to object to GSA's decision not to amend or resolicit the RLP based on alleged changed requirements by

not bringing a pre-award challenge.  *See Blue Origin Fed'n, LLC v. United States*, 157 Fed. Cl. 74, 103 (2021).

**H.      GSA Did Not Engage in Unequal Discussions With CJN.**

In its eighth and final count, Second Street argues that GSA had unequal discussions with CJN between the submission of final proposal revisions and award.  ECF No. 27 at 45.  It alleges that these discussions were prejudicial because they allowed CJN to remedy technically unacceptable aspects of its proposal or to update its proposal in ways that were not technically acceptable.  *Id.* at 45–46.  Two of the cited occurrences concern conditional financing and the occupancy date, issues that have already been discussed at length in this opinion and rejected.  *See id.* at 46 (alleging that GSA's requests for an updated construction schedule and conditional financing documentation constituted discussions).  With respect to a third incident, Second Street alleges that as a result of improper discussions CJN "eliminate[d] an elevated walkway between buildings that had been deemed unacceptable under the NHPA [National Historic Preservation Act]."  *Id.* at 45.

The Government and CJN argue, on the other hand, that the CO properly requested additional information about financing and schedule as part of his responsibility determination and properly engaged CJN regarding NHPA mitigation measures pursuant to the RLP.  ECF No. 30 at 48–51; ECF No. 31 at 35.  The Court agrees.

GSAM 570.307 instructs contracting officers to follow "the procedures in FAR 15.306 and 15.307 for exchanges (including clarifications, communications, negotiations, discussions, and revisions)."  GSAM 570.307(a).  These FAR sections require a contracting officer to conduct discussions in a negotiated procurement with each offeror in the competitive range and in a manner that does not favor one offeror over another, FAR 15.306(d)(1), (e)(1), and to establish a common

cut-off date for final proposal revisions after which further revisions will not be considered, FAR

15.307(b). *See Info. Tech. & Applications*, 316 F.3d at 1321.

Here, the RLP unquestionably permitted GSA to communicate with CJN as the ASO to

ensure the project's compliance with NHPA prior to executing the lease. Specifically, section

5.01(S) of the RLP advised that the Government may "request information from and share

information provided in response to this section with local, state or federal regulatory agencies to

carry out the Government's responsibilities related to compliance with [NHPA]," among other

federal statutes. AR 302; *see* AR 289 (advising offerors of the Government's NHPA obligations

and reserving the right to reject proposals that, among other things, would have "adverse effects

to historic properties *that cannot be reasonably mitigated*," RLP 2.12(D) (emphasis added)). It

further advised that the Government would provide "the intended awardee with written notice of

[any] mitigation measures" that must be taken to the site to ensure compliance with NHPA. AR

302. It required the offeror to either withdraw its offer within 10 days of receiving that notice or,

if not withdrawn, the identified mitigation measures would be incorporated into the final lease

documents. *Id.* Moreover, section 2.12 of the RLP and section 3.54 of the lease contemplated that

"compliance [with NHPA] may require tailoring the design" of the project. AR 289; *see* AR 330.

The communications between GSA ad CJN regarding the exterior walkway, as well as CJN's

agreement to eliminate the walkway, are entirely consistent with the mitigation process described

in the RLP and lease. AR 776, 8248–54, 8441, 8822. Thus, contrary to Second Street's claim,

GSA did not unfairly allow CJN to revise a technically unacceptable design following final

proposal revisions.

Second Street's claim with respect to CJN's updated information on conditional financing

and proposed construction schedule likewise fail. As acknowledged by Second Street, these issues

concerned the CO's responsibility determination.  Because "responsibility determinations are made at the time of award," an agency may request and consider "evidence subsequent to bid opening but prior to award to demonstrate the bidder's responsibility."  *DynCorp Int'l LLC v. United States*, 76 Fed. Cl. 528, 547 (2007) (quoting *Blount, Inc. v. United States*, 22 Cl. Ct. 221, 226–27 (1990) (finding no error in a contracting officer asking for an offeror's updated financial documents)); *see Lawson Env't Servs., LLC v. United States*, 126 Fed. Cl. 233, 247 (2016) (holding that "an offeror may present evidence subsequent to proposal submission but prior to award to demonstrate the bidder's responsibility").  Accordingly, no "discussions" regarding these issues occurred.

## I.     No Injunctive Relief is Warranted Because Second Street Fails on the Merits.

A party seeking permanent injunctive relief must show that: (1) it "has succeeded on the merits of the case;" (2) it "will suffer irreparable harm if the court withholds injunctive relief;" (3) "the balance of hardships to the respective parties favors the grant of injunctive relief;" and (4) "it is in the public interest to grant injunctive relief."  *PGBA, LLC v. United States*, 389 F.3d 1219, 1228–29 (Fed. Cir. 2004).  Because Second Street has not succeeded on the merits of its protest, no injunctive relief is warranted in this case.  *See Mitchco Int'l, Inc. v. United States*, 26 F.4th 1373, 1384 n.7 (Fed. Cir. 2022); *ANHAM FZCO v. United States*, 149 Fed. Cl. 427, 439 (2020) (quoting *Dell Fed. Sys., L.P. v. United States*, 906 F.3d 982, 999 (Fed. Cir. 2018)).

## J.     Second Street's Motions to Supplement the Administrative Record Are Denied.

In addition to moving for judgment on the record, Second Street filed two motions to supplement the administrative record.  The first motion seeks to supplement the record with the declaration of Jeffery Sussman, President of Property Group Partners, LLC—Second Street's authorized agent during the procurement and this bid protest.  Pls.' Mot. to Suppl. Admin. R. at 2, ECF No. 23.  Second Street explains that the declaration is submitted to establish the competitive

prejudice resulting from GSA's waiver of the conditional financing and occupancy date requirements for CJN, as well as to establish irreparable harm in support of Second Street's request for a permanent injunction. *Id.* at 3–5.

In the second motion, Second Street requests to supplement the record with an article published in an industry bulletin on August 19, 2022, which reports that CJN (through Douglas Development and Midtown Equities) is "looking to line up around $700 million of debt for development of a Washington office property that will serve as the SEC's new headquarters." Ex. A, Pls.' Second Mot. to Suppl. Admin. R. at 3, ECF No. 47-1. Second Street argues that this new evidence is "further evidence of the arbitrary and capricious manner in which GSA evaluated CJN's proposal for "[s]atisfactory evidence of at least a conditional commitment of funds necessary to prepare the Space . . . ." Pls.' Second Mot. to Suppl. Admin. R. at 5, ECF No. 47 (quoting AR 454).

Parties in a bid protest may supplement the administrative record only in limited circumstances. This is because, on a motion for judgment on the administrative record, "the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court." *Axiom Res. Mgmt., Inc. v. United States*, 564 F.3d 1374, 1379 (Fed. Cir. 2009) (quoting *Camp*, 411 U.S. at 142). By limiting its review to the "record actually before the agency," the Court guards against "using new evidence to convert the arbitrary and capricious standard" applicable to bid protest actions "into effectively de novo review." *Parcel 49C Ltd. P'ship v. United States*, 130 Fed. Cl. 109, 121 (2016) (quoting *Axiom*, 564 F.3d at 1380) (internal quotation marks omitted). Thus, an administrative record "should be supplemented only if the existing record is insufficient to permit meaningful review consistent with the [APA]." *Axiom*, 564 F.3d at 1381.

With respect to the first motion, the Court need not determine whether Mr. Sussman's declaration is necessary to meaningful judicial review of the parties' cross-motions for judgment. As explained above, Second Street has not met its burden to show that GSA acted arbitrarily and capriciously, or violated any procurement law, in evaluating proposals and awarding CJN the lease. Because Second Street fails at the first step, the Court need not proceed to step two and determine whether Second Street was competitively prejudiced by the alleged waiver of conditional financing and occupancy date requirements for CJN. Similarly, Second Street fails on the merits of its claims, and thus is not entitled to permanent injunctive relief, regardless of any irreparable harm it alleges.

As to the second motion, Plaintiff has failed to demonstrate that—absent supplementation—the Administrative Record is insufficient to permit meaningful review. Because the August 2022 article post-dates the lease award to CJN by almost a year, it is undisputedly extra-record evidence that was not (and could not have been) considered directly or indirectly by GSA at the time it evaluated the parties' proposals and selected CJN as the awardee. *See Safari Club Int'l v. Jewell*, 111 F. Supp. 3d 1, 4 (D.D.C. 2015) (holding that an administrative record in an APA review case consists of "all documents and materials that the agency directly or indirectly considered" and "neither more nor less"). Second Street does not allege or show that the Court's review of the article is necessary, for example, to correct mistakes and fill gaps in the Administrative Record, which some courts have found an appropriate use of supplementation. *See, e.g.*, *Pinnacle Sols., Inc. v. United States*, 137 Fed. Cl. 118, 131 (2018) (citing *Axiom*, 564 F.3d at 1379–81). Nor has it demonstrated that consideration of the article is necessary to decide the legal issues raised by its claims in Counts I and IV. Specifically, the facts reported in the article relate to the *current* status of CJN's financing for the new SEC headquarters subject to the lease award.

42

It has no bearing on the Court's interpretation of RLP 3.06(C) or to its analysis of whether GSA rationally determined *prior to award* that CJN provided sufficient evidence of conditional financing and was financially responsible.

Regardless of the link Second Street contends exists between the RLP's conditional financing requirement and the lease's firm commitment of financing provision, post-award events are not determinative of whether GSA's pre-award evaluation of then-present responsibility, based on the available information before the CO at that time, was arbitrary and capricious.  Several judges of this Court have rejected similar requests to supplement the record.  *See, e.g.*, *Precision Std., Inc. v. United States*, 69 Fed. Cl. 738, 745 (2006), *aff'd*, 228 F. App'x 980 (Fed. Cir. 2007) (post-award email correspondence found to be irrelevant to the contracting officer's pre-award responsibility and eligibility determinations); *Trillion ERP Venture Tech LLC v. United States*, No. 22-152C, 2022 WL 3332605, at *9 (Fed. Cl. Aug. 12, 2022).  Conversely, Second Street has cited no case where the court allowed supplementation of the record with evidence that merely bolstered or "corroborated" a party's argument.[11]

### IV. CONCLUSION

For these reasons, the Court **GRANTS** the Government's and CJN's Cross-Motions for Judgment on the Administrative Record (ECF Nos. 30, 31).  The Court **DENIES** Second Street's Motion for Judgment on the Administrative Record (ECF No. 24), **DENIES AS MOOT** its Motion to Supplement the Administrative Record (ECF No. 23), and **DENIES** its Second Motion

---

[11] In its motion, Second Street requests in the alternative that that the Court take judicial notice of the fact that CJN has not provided the Government with a firm commitment of financing, ECF No. 47 at 5; however, it appears to have abandoned that request since neither the Government nor CJN confirmed (or denied) that fact, Pls.' Reply at 10-11, ECF No. 51.

to Supplement the Administrative Record (ECF No. 47).  The Clerk is directed to enter judgment accordingly.

This opinion and order will be unsealed in its entirety after October 3, 2022, unless the parties submit **by no later than September 28, 2022**, an objection specifically identifying the protected information subject to redaction.  Any objecting party must submit a proposed redacted version of the decision and provide the reason(s) supporting the party's request for redaction.

**SO ORDERED.**

Dated: September 19, 2022                         _____*/s/ Kathryn C. Davis*_____
                                                 KATHRYN C. DAVIS
                                                 Judge